# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched or identify the* )<br>*person by name and address)* )<br> )<br>19321 Beach Boulevard )<br>Huntington Beach, CA 92648 )<br> )<br> )<br> ) | Case No. 2:21-MJ-03642 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-6*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud and Bank Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Ashlea R. Bowens
_____
*Applicant's signature*

Postal Inspector Ashlea R. Bowens
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>                Hon. Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Monica E. Tait, x2931, 11th Floor

## ATTACHMENT A-6

PREMISES TO BE SEARCHED

The premises to be searched is located at 19321 Beach Boulevard, Huntington Beach, California 92648 (the "SUBJECT PREMISES").

The SUBJECT PREMISES is further described as a two-story house with a driveway to the left of the structure.

The SUBJECT PREMISES includes all guesthouses, annexes, attics, porches, garages, carports, outside yard (including all sheds or storage space), mailboxes, trash containers, debris boxes, and all vehicles, whether parked in any garage or driveway of the SUBJECT PREMISES.

Photograph:



**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Conspiracy to Commit Wire Fraud and Bank Fraud, in violation of 18 U.S.C. § 1349; Wire Fraud, in violation of 18 U.S.C. § 1343; and Bank Fraud, in violation of 18 U.S.C. § 1344 (the "Subject Offenses"), namely:

a.   From January 1, 2013 to the present:

i.   All records and communications concerning Automated Clearing House ("ACH") debits or remotely created check ("RCC") debits.

ii.   All records and communications concerning return rates and the manipulation of return rates, including through the use of ACH and RCC micro debits or transactions.

iii. All records concerning persons and entities conducting or used to conduct or facilitate unauthorized debits or micro transactions, including the Benoit Entities described in the affidavit used to obtain this warrant, and any payment processors.

iv.   All records concerning the business operations of any of the Benoit Entities described in the affidavit used to obtain this warrant, including records indicating that those entities provided no products or services.

v.   U.S. currency of $1,000 or more; bearer instruments worth $1,000 or more (including cashier's checks and

traveler's checks); and precious metals and stones worth $1,000 or more.

vi.  All records concerning bank accounts, money transfers (including by Zelle or other digital applications), or concealment of accounts, funds, or transfers.

vii. Indicia of occupancy, residency or ownership of any SUBJECT PREMISE described in the affidavit used to obtain this warrant, or any items to be seized described in this warrant, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing.

viii.    Contents of any calendar or date book.

b.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

c.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.  evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

iii

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall

complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress any SUBJECT PERSON's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of any SUBJECT PERSON's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Ashlea R. Bowens, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Postal Inspector with the United States Postal Inspection Service ("USPIS").  I have been employed as a Postal Inspector since 2012. I am currently assigned to the U.S. Department of Justice ("DOJ"), Consumer Protection Branch in Washington, D.C., to investigate fraud schemes targeting American consumers in violation of federal law.  Since being employed as a Postal Inspector, I have led, conducted and/or participated in criminal investigations involving Mail Fraud, Wire Fraud, Government Impersonation, Mail Theft, Identity Theft, Assault, Robbery, and Homicide.  I have also successfully completed various training programs provided by the USPIS and the DOJ, including in Money Laundering and Asset Forfeiture.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of applications for search warrants for the following persons (each a "**SUBJECT PERSON**") and premises (each a "**SUBJECT PREMISES**"), as further described in the corresponding attachments:

| Person or Premises | Label | Att. A |
|---|---|---|
| Person of EDWARD COURDY | **COURDY** | A-1 |
| 21606 Juan Avenue, Hawaiian Gardens, CA 90716 | **COURDY RESIDENCE** | A-2 |
| 1901 Redondo Avenue, Signal Hill, CA 90755 | **COURDY OFFICE** | A-3 |

1

| 700 Wilshire Boulevard, Los Angeles, CA 90017, First Floor, Cabinet ID YY2 | **COURDY SERVERS** | A-4 |
|---|---|---|
| Person of ERIC BAUER | **BAUER** | A-5 |
| 19321 Beach Boulevard, Huntington Beach, CA 92648 | **BAUER RESIDENCE** | A-6 |

3.    Attachments A-1 through A-6 and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

### III.  ITEMS TO BE SEIZED

5.    The items to be seized are the evidence, fruits, and instrumentalities of violations of Conspiracy to Commit Wire Fraud and Bank Fraud, in violation of 18 U.S.C. § 1349; Wire Fraud, in violation of 18 U.S.C. § 1343; and Bank Fraud, in violation of 18 U.S.C. § 1344, as described in Attachment B.

### IV. SUMMARY OF PROBABLE CAUSE

6.    The government is investigating a transnational network of fraudsters that has been victimizing American

2

consumers through unauthorized debits against victim bank accounts.  Led by Canadian-based main organizer Guy Benoit ("Benoit"), the fraudsters maintained numerous shell companies (each a "Benoit Entity").  Purporting to offer technology-related services, some of the Benoit Entities generated, and caused to be generated, unauthorized debits that falsely claimed to be subscriptions by consumers to those services.

7.   This scheme often resulted in rates of return (<u>i.e.</u>, claims of unauthorized transactions) on the Benoit Entities' transactions that exceeded their processing banks' tolerance thresholds.  To maintain their banking relations, the Benoit Entities sought to defraud their banks by causing large numbers of small, sham debits to be made from accounts controlled by or for them.  These "micro transactions" masked the Benoit Entities' true return rates and presented the banks with a false sense of risk of loss, potentially enabling accounts that otherwise would have been closed to remain open.

8.   The Benoit Entities' unauthorized debits and micro transactions often transited the Automated Clearing House ("ACH") network.  At other times, the Benoit Entities used remotely-created checks, wherein they caused to be presented to their own banks, for deposit, fraudulent checks that falsely claimed to have been authorized by the alleged subscribers/victims.  To process the transactions, Benoit sometimes enlisted the services of third-party payment processors.  There is probable cause to believe that **COURDY**, through his California-based corporation, Internet Transaction

Services, Inc. ("Intertrans"), was a partner of Benoit in devising and executing the fraud schemes. **COURDY,** through Intertrans, helped broker payment processor relationships for Benoit and the Benoit Entities and advised Benoit on maintaining his operations.

9.     Although controlled by Benoit, the Benoit Entities and associated business accounts were often maintained in the names of other conspirators.  There is probable cause to believe that **BAUER** assisted with several Benoit Entities.  In addition to serving as a nominal owner, **BAUER** opened bank accounts for Benoit Entities, one of which he appears to have opened with **COURDY.**

## V.   <u>STATEMENT OF PROBABLE CAUSE</u>

10.     As part of this and a related investigation, the Postal Inspection Service obtained numerous emails through search warrants.  On April 9, 2019, the United States District Court for the District of Nevada issued search warrants under case numbers 2:19-mj-250 and 2:19-mj-251 for two email accounts associated with a payment processor named U Solutions Group, LLC.  Based in part on evidence found in the U Solutions Group emails, the United States District Court for the Southern District of Texas, on June 25, 2020, issued search warrants under case numbers 4:20-mj-1137, -1138, -1139, and -1140 to GoDaddy.com, LLC ("GoDaddy"), a provider of internet domain hosting services, for numerous accounts with internet domains associated with Benoit.  Among the U Solutions Group emails and the GoDaddy emails were several thousand emails that explicitly

4

involved **COURDY** and/or **BAUER**, numerous of which are discussed below.

**A.   Background on ACH Debits and Remotely Created Checks**

11.   Based in part on my review of materials published or posted by the Federal Reserve Banks and the National Automated Clearing House Association ("NACHA"), including the NACHA Operating Rules & Guidelines, 2015 edition ("NACHA Manual") and 2016 edition, I know the following about ACH transactions:

a.   The ACH network is a nationwide electronic funds transfer system that enables inter-bank processing of electronic debit and credit transactions and the sharing of payment-related information between financial institutions.   The ACH network is administered by NACHA and operated by ACH operators, including the Federal Reserve Banks through the "FedACH" service.   NACHA has, among other things, developed operating rules and guidelines for the ACH network and electronic fund transfers between the network's participants.

b.   An ACH transaction is, in industry parlance, referred to as an "entry."   NACHA Manual § 8.36.   The parties to an entry are often an "originator," an "originating depository financial institution" ("ODFI"), a "receiver," and a "receiving depository financial institution" ("RDFI").   §§ 8.65, 8.67, 8.80, 8.82.   A "debit entry" is generally an order or request by an originator for the withdrawal of money from the receiver's account at the RDFI into the originator's account at the ODFI.

c.   An RDFI must accept debit entries that comply with the NACHA rules and are received for accounts at that RDFI,

subject to its right to "return" entries under the rules.  NACHA
Manual § 3.1.1.  A "return" on a debit is a debit entry
initiated by an RDFI or ACH operator that returns a previously
originated debit entry to the ODFI within a certain timeframe.
§ 8.91.  Subject to certain restrictions, an RDFI may otherwise
return a debit entry for any reason.  § 3.8.

        d.   The RDFI must specify a "return reason code" for
each return.  NACHA Manual Appendix Four Part 4.2 is a table of
return reason codes.  "Unauthorized" returns, as defined at
§ 8.110, include code R10, which means that the receiver advised
the debit was unauthorized, improper, ineligible, or part of an
incomplete transaction.  "Administrative" returns, as defined at
§ 8.4, include codes R02, R03, and R04, which mean,
respectively, account closed, unable to locate account, and
invalid account number.

        e.   NACHA's rules include thresholds for return
rates.  Starting September 18, 2015, the rules set the
thresholds for an originator's debit returns, as a percentage of
total debits, as 0.5% for unauthorized returns, 3.0% for
administrative returns, and 15.0% for overall returns.  NACHA
Manual §§ 8.5, 8.70, 8.111.  An originator who exceeds these
thresholds exposes its ODFI to review by NACHA; the ODFI may be
assessed fines for NACHA rules violations and, in some cases,
could be directed to suspend the originator from originating.
§ 2.17.2; App'x 10 Subpart 10.4.7.

    12.   In my training and experience, I understand that, if a
return on a debit entry occurs after an ODFI credits the funds

to its customer and the customer withdraws the funds, the ODFI
risks paying for the return (i.e., repaying the funds to the
party whose account was debited those funds, because the
customer's account does not have the funds anymore).  Thus, a
customer whose debit entries have high return rates poses a risk
of loss to the institution servicing that customer's account.

13.  Based in part on my review of materials published by
the Federal Reserve Banks and Regulation CC (12 C.F.R.
Part 229), I know the following about remotely created checks:

a.  A "check" includes a "negotiable demand draft
drawn on or payable through or at an office of a bank."  12
C.F.R. § 229.2(k)(1).  A "depositary bank" is the bank holding
the account into which a check is deposited.  § 229.2(o).  A
"paying bank" includes the bank at which a check is payable and
to which the check is sent for payment or collection.
§ 229.2(z)(2).

b.  A "remotely created check" is a check that was
"not created by the paying bank and that does not bear a
signature applied, or purported to be applied, by the person on
whose account the check is drawn."  12 C.F.R. § 229.2(fff).
According to Appendix E, § II(FFF), of Part 229 (Commentary), an
example of a remotely created check is a "check authorized by a
consumer over the telephone that is not created by the paying
bank and bears a legend on the signature line, such as
'Authorized by Drawer.'"

14.  In my training and experience, I understand that,
similarly to returns on ACH debits, returns on checks subject a

7

depositary bank to risk of loss.  However, return rates on checks are not subject to industry-wide thresholds as are ACH return rates.

**B.    Background on COURDY and Intertrans**

15.  According to California Department of Motor Vehicles records that were accessed on April 9, 2020 and effective until January 5, 2023, **COURDY** was born in 1950 and resides at the **COURDY RESIDENCE.**  The **COURDY RESIDENCE** appears to be a single-family house.  In July 2021, a U.S. Postal Inspector confirmed that mail was then being addressed and delivered to **COURDY** and others at the **COURDY RESIDENCE.**

16.  California Secretary of State business filings show that Intertrans filed a "statement and designation by foreign corporation" on June 10, 2002, stating that it was incorporated under Michigan law and that its principal executive office was located at 110 Pine Avenue, Suite 1080, Long Beach, CA 90802. It also designated its agent for service of process in California as **COURDY** at the **COURDY RESIDENCE.  COURDY** signed the filing as "Pres./Ceo."  In a filing dated September 24, 2015, Intertrans changed the address for itself and for **COURDY** to 115 Pine Avenue, Suite 600, Long Beach, CA 90802.  That filing also listed **COURDY** as president, chief executive officer, secretary, and chief financial officer, and Intertrans's business type as "INDEPENDENT FINANCL [sic] SALES ORG." The most recent filing was on March 30, 2020, and asserted no change in information.

17.  Michigan Department of Licensing and Regulatory Affairs business filings show that Intertrans filed its articles

of incorporation in Michigan on February 28, 2002.  In its annual report for year 2019, Intertrans listed **COURDY** as president, treasurer, secretary, and director, with an address at 115 Pine Avenue, Suite 600, Long Beach, CA 90802.  The filing listed Intertrans's business as "CONSULTING & FINANCIAL SERVICES."  Intertrans's annual report for year 2020 was signed by **COURDY** on August 7, 2020, and certified no changes from its prior annual report.

18.  According to emails I reviewed in the U Solutions Group emails and the GoDaddy emails, Intertrans uses the internet domain intertrans.com.  **COURDY'**s email address is eddie@intertrans.com.

C.    **Background on Benoit and Benoit's Entities**

19.  According to California Department of Motor Vehicles records that were accessed on April 2, 2020 and expired on October 11, 2017, Benoit was born in 1954 and resided at the **COURDY RESIDENCE.**  The application and photo date for Benoit's California DMV record was February 28, 2013.

20.  I believe that Benoit used the telephone number 702-605-4005 and email address guy@cbxiinc.com, among others.  In September 2020, the government obtained certain non-content information from Microsoft Corp. for telephone number 702-605-4005.  Microsoft manages Skype Communications S.A.R.L., a provider of voice-over-internet-protocol ("VoIP") services. According to the Microsoft records, 702-605-4005 was a Skype number subscribed to username "guybenoit1" starting January 4, 2013, with a short break in service of several hours on July 4,

2013, and continuing through the production date.  Also according to the Microsoft records, the Skype account for "guybenoit1" was created on March 15, 2008, and had a registered email address of guy@cbxiinc.com as of the production date. Microsoft further disclosed that "guybenoit1" was an alias of Microsoft account guy.benoit40@hotmail.ca.

21.  I believe that Benoit, often through coconspirator nominal owners like Harold Sobel and Randy Grabeel, controlled numerous entities (collectively, "Benoit Entities"), including, but not limited to, the six listed below.  Each Benoit Entity had an internet domain for its website and email accounts:

| Benoit Entity | Internet Domain |
|---|---|
| CBX International, Inc. | cbxiinc.com |
| Ecloud Secure LLC | ecloud-secure.com |
| I-Support Group Inc. | isupport-pro.com |
| My Kloud Box LLC | mykloudbox.com |
| NRG Support LLC | nrg-support.com |
| Silver Safe Box LLC | silversafebox.com |

22.  Benoit controlled the Benoit Entities' email accounts and websites.  In February and September 2020, the government obtained certain non-content information from GoDaddy for the internet domains related to the Benoit Entities:

a.   The email accounts and websites of CBX International, Ecloud Secure, I-Support Group, NRG Support, and Silver Safe Box were purchased and maintained through a single, active account at GoDaddy.  The customer name was "Harold

10

Sobel," company "NRG Support," with an address in Las Vegas, Nevada. The mobile telephone number for this GoDaddy account was 702-605-4005. The email address for the account was guy@cbxiinc.com.

    b.   The domain for My Kloud Box was subscribed to a different GoDaddy customer account. The customer name was also "Harold Sobel," with the same address in Las Vegas, Nevada. The work telephone number for this GoDaddy account was 702-605-4005. The email address for the account was harold@nrg-support.com.

    23.   The GoDaddy emails showed that Benoit personally used many of the Benoit Entities' email accounts, including those in the names of coconspirators Harold Sobel and Randy Grabeel, such as harold@nrg-support.com and randy@ecloud-secure.com. The emails showed that Sobel and Grabeel did not use these email accounts, but rather communicated with Benoit using personal Gmail, Yahoo, or ProtonMail accounts. Benoit then pretended to be the coconspirator nominal owners when emailing from the Benoit Entities' email accounts with third parties such as banks.

    D.   **Benoit's Fraud Scheme**

        1.   Unauthorized Debits

    24.   According to their websites, a "customer service" call center, and bank and other records, some of the Benoit Entities purported to offer technology-related services, such as cloud storage. According to consumer complaints and emails I reviewed involving the Benoit Entities, among other evidence, Benoit generated debits against victims' bank accounts in the names of

the Benoit Entities, falsely claiming the debits to be authorized subscriptions to the Benoit Entities' services.

25.  For example, on May 13, 2020, the USPIS interviewed a complainant who filed a report against NRG Support.  The complainant, who reported residing in Baytown, TX, advised she noticed unauthorized debits in the amount of $39.95 occurring intermittently between July 2015 and January 2017. The complainant said she obtained, from her bank, a phone number to contact the business that debited her account.  The complainant said she called and spoke to an unknown individual who said the complainant had signed up for a free trial "data usage" service with "NRG Support, LLC."  The complainant said she was told the free trial period had expired, and she had been charged for the recurring subscription.  The complainant advised the USPIS that she did not own a computer, nor had she at the time she was charged for the unauthorized debits.  In addition, the complainant stated she had not signed up for any services online, and had not heard of "NRG Support, LLC" prior to the company debiting her account.

26.  As another example, the USPIS received a sworn declaration, dated July 20, 2021, from a complainant in Macomb County, Michigan.  This complainant is an Assistant Prosecuting Attorney in that jurisdiction.  According to the declaration and previously filed reports that I have reviewed, the complainant reported noticing a series of $45 unauthorized withdrawals, totaling approximately $405, from his bank account to Ecloud Secure.  When he called Ecloud Secure, he was told that he had

12

signed up for its online storage account.  When told the email
address and mailing address that he had supposedly used to open
the account, the complainant recognized them as his old law
school email address and his parents' address, neither of which
he had used for years.

        2.   <u>Victim Leads</u>

27.  Emails show that, in response to bank inquiries
regarding complaints of unauthorized debits, the Benoit Entities
produced purported proofs of authorization, claiming that the
debited consumers had signed up for the relevant Benoit Entity's
service.  In response to inquiries from Better Business Bureau
offices and state attorneys general, the Benoit Entities claimed
to obtain consumer information only through online registration,
not through purchasing lead lists.  For example, in an email
exchange in July 2018, Benoit at guy@ecloud-secure.com and "Liz"
at liz@nrg-support.com discussed a consumer complaint inquiry
from the Arizona Attorney General's Office.  Liz told Benoit
that the following response was provided in the inquiry:
"[Complainant] also mentioned that she would like to know what
company sold her information, we do not know what company she is
referring to. Ecloud Secure['s] only means of obtaining client
information is online registration."

28.  Based on my review of emails and other records cited
herein, I believe that the Benoit Entities' claim to sign up
customers only through their websites was false.  First, the
Benoit Entities' websites were a front.  In April 2020, **COURDY**
sent Benoit at guy@cbxiinc.com an email with the subject "Ghost

Sites" in which **COURDY** advised Benoit that "none of your sites are live," meaning that "an email is sent to the person putting the transaction in, but there is no coding on the backside of your site that actually sends that transaction to your gateway, imports it and then sends the transaction into your bank." **COURDY** warned, "[i]f this is correct that it is simply a ghost site, you really need to correct this situation." **COURDY** further stated, "I know for a fact that all your sites at one time were able to accept a transaction and process it to the bank.  Please look into this.  It is very dangerous if . . . yours is inactive.  I just found out today that Tech Connect is a Ghost site and did not take a live transaction through the system.  That is being corrected within the next 24 hours."  I believe "Tech Connect" to refer to "Tech-Connect," an entity associated with **COURDY,** Benoit, and the **BAUER RESIDENCE**, as explained below in ¶ 72.

29.  Furthermore, emails show that Benoit generated consumer debits off lead lists.  For example:

a.   In a December 2015 email chain that appears to have been about lead invoices, Benoit at guy@nrg-support.com sent **COURDY** an email with the subject "Traffic Invoice-11/30 and Wire Instructions" in which he stated in part, "If you are able to provide me 1000 orders a day .... then in about a month I would be paid back .... But again PDL do not retain, ( this is 5 years of experimenting ) .... But I guess I have no choice but to hope they could be different."  (Based on my training and experience and a different email exchange between Benoit and

14

**COURDY** in April 2018, I believe "PDL" is short for "payday loan"
lead lists.)  **COURDY** responded in part, "There is traffic that
will be sent."

b.   In an email dated August 24, 2017, Benoit at
jennifer@ecloud-secure.com forwarded to "Debra Vogel" at
debra@dollarwebsales.com audit results for "ECS BATCH 6576"
showing 96 returns from 107 deposits, for a return rate of
89.72%.  Benoit complained, "Processed 200 orders of your last
file .....its very bad !  The last two files are as bad .....
did not have time to follow them !  These are not RO [I believe
short for 'recurring order,' as in, a previously debited
account] orders at all !  I would like a refund ....will send
you back what I did not process."  I believe this email shows
that Benoit received the banking information to charge the "200
orders," from "Debra," and not from 200 customers who signed up
for services on a Benoit Entity website.

c.   On or about February 14, 2019, info@ecloud-
secure.com sent a "confirmation of registration and payment"
email to a Yahoo email address.  The email thanked a "Derrick
Brown," listing an address in Las Cruces, New Mexico, for
signing up for a $45 monthly plan at Ecloud Secure.  The Yahoo
email account responded, "I did not sign up for this and I have
not lived at that address for 8 years."  Benoit at guy@ecloud-
secure.com forwarded this response to a coconspirator,
directing, "Pls find where this lead comes from These leads are
VERY bad .... Need to know where they come from."

30.   The emails showed that Benoit and his coconspirators expected to cull new victim lists to small sets of recurring orders or "RO" that they could repeatedly debit.  For example, in May 2016, Benoit at guy@nrg-support.com sent "Steven Morgan" at steven@nrg-support.com an email in which he listed $8,040 in returns and said, "Processing 200 new orders a day .... That's 8,000 Per day .... An[d] today we have 8,040 in returns ! ....... guess not much is sticking ?"  Morgan responded, "New orders are garbage, something you have know [sic] for a very long time. 12% will stick. So on 200 24 will be good the 176 will return. You shouldn't be shocked at this point."  Benoit then replied, "I realize that to get a base of RO .... It takes a huge investment ..... so moving forward, we must find out the why of the R2,3,4 [I believe referring to the NACHA ACH administrative return codes] and buy better leads .....otherwise the old way of doing things is expensive."  Morgan responded, "We have to find a 'sweet spot' as the db [I believe short for 'database'] ages the retension [sic] will get better as these new drop off."

31.   The Benoit Entities sometimes sold their victim lists as leads to other "merchants."  For example, in an email chain from January 2016, "Mike Young" at mike@intertrans.com sent an email with the subject "Suppression List For New Leads" to Benoit at guy@isupport-pro.com and guy@nrg-support.com, copying **COURDY**.  Young wrote, "Guy, please see the attached suppression file from the person that wants to buy the leads.  He has been bugging me all day so hopefully we can get this handled soon as

he will start ordering on a daily basis and then each week it will be a minimum of 1,000.  Please see if one of your guys can match this against your records though and pull out as many good results that you have leftover and send some to me.  Obviously I don't need your whole database at once but if you can send a couple thousand that will get everyone rolling."

### 3.  High Return Rates

32.  The Benoit Entities' fraud scheme resulted in high return rates on the consumer debits.  The following example came from an email chain on or about October 5, 2016 between **COURDY**, Benoit, and payment processor U Solutions Group regarding audit results for transactions submitted by I-Support Group for September 23, 26, 27, and 28, 2016:

a.  The audit results included spreadsheets for each of the four days, which listed an approximate aggregate of 868 submitted transactions of $40 each (totaling approximately $34,720).  In addition to the submitted transactions for each day, the spreadsheets also detailed the processed and denied transactions for each day, as well as the transactions that had been returned to date (apparently October 3, 2016).

b.  The audit showed the overall return rates for those four dates to be 84.41, 71.08, 59.73, and 49.20 percent, respectively.  This means, for example, that of the 154 debits that U Solutions Group processed that I-Support Group submitted on September 23, 2016, 130 were returned.  The return code for 42 of those 130 debits was "Closed Account" and for 54 of them was "UTLA," which I know to mean "unable to locate account."

33.   **COURDY** and Benoit knew what the return rates were
expected to be.  Their emails contained numerous discussions of
relevant thresholds.  For example, on or about January 12, 2016,
guy@nrg-support.com received an email from **COURDY** that stated,
"Administrative returns, which is the R2's, 3's and 4's must be
under 3% according to the new NACHA rules and regulations.
Total returns are required to be under 15%."

34.   **COURDY** and Benoit also knew that high return rates
posed problems for the Benoit Entities.  The emails showed that
the Benoit Entities constantly had issues maintaining payment
processors and banking relationships.  The following example
came from an email chain on or about July 30, 2015 between
**COURDY**, Benoit, and payment processor "Paymitco" that appears to
have been about I-Support Group:

a.   **COURDY** initially received an email from Paymitco
entitled "I support status."  Paymitco advised that the bank
accounts used by I-Support were frozen and that "[t]he bank has
reached out to at least a dozen consumers who claim they were
billed twice in a 30 day period and the consumer is signing an
affidavit stating they haven't used that phone number & address
in over 2 years and had no idea what Pro Logic[1] is. Plus 2 of
them were over 65 years old. The bank is requesting signed
authorizations of every chargeback."  Paymitco continued, "We

---

[1] Based on my review of other emails, I believe that I-
Support's purported service or product, for which consumers were
debited, was called "Pro Logic."  For example, an email chain
dated August 2015 between john@nrg-support.com and eric@nrg-
support.com regarding Paymitco chargebacks referred to I-
Support's "product" as "Pro Logic Pack."

have been running back through the client [sic] of I-support today and out of 373 calls made to randomly selected clients not a single client claimed they knew who they were and authorized." Paymitco ended the email with a proposal to switch I-Support to a different bank: "There does however exist one bank we have that hasn't been used in 3+ months. We would have to start out slowly with this bank for the first week to ascertain the bank's appetite for 25%+ returns and certainly angry consumer calls. To me this is a throw away channel and I am willing to risk the channel under the following conditions."

      b.   **COURDY** forwarded Paymitco's email to Benoit at guy@nrg-support.com, seemingly without comment.

      c.   Benoit then forwarded **COURDY**'s email to john@nrg-support.com, writing: "Hello Sir, I just read the e-mail from the owner of Paymitco ... a real mess finally ! .....do not submit any new orders there ... we will start this process some other place . . . Guy[.]"

      4.   <u>Micro Transactions</u>

   35.  In addition to switching banks and payment processors, the Benoit Entities conducted and caused to be conducted micro transactions. These low-dollar debit entries, generally less than $2 each, when run in large numbers, would artificially inflate the volume of debits originating from the Benoit Entities' accounts. Unlike the unauthorized debit entries against the consumer-victims' bank accounts, the micro transactions were funded by other bank accounts controlled by or for the Benoit Entities and thus these charges would not risk

19

returns or chargebacks.  Therefore, the micro transactions would artificially depress the return rates on the Benoit Entities' accounts.  These artificially low return rates would then present the banks servicing the accounts with a false sense of risk about the Benoit Entities, with the intent of inducing the banks to keep open accounts that would otherwise be closed.

36.  The following emails in an email chain between Benoit as "Harold Sobel" at harold@nrg-support.com, "Steven Morgan" at steven@nrg-support.com, and personnel at payment processor "Paytechco" from October 2015 illustrate the intent behind the micro transactions:

a.  The initial email in the chain was from Benoit to Paytechco, protesting a "warning letter" regarding his unauthorized return rate, apparently for NRG Support, complaining that he thought the rate was lower.  The email contained tables showing audit results for September 2015, indicating 37,609 processed transactions at $333,679.55, with 1,072 returns, or 2.83%, worth $42,826.40.  Of those transactions, 120, or 0.32%, were listed as unauthorized returns.  The tables separately listed another 47 late returns, all unauthorized, for $1,877.65.

b.  Paytechco responded, explaining the need to account for late returns, which may not appear in the audit report for a particular month:  "More troubling is the tendency in unauthorized returns for previous months due to these late returns. Before September we can see an unauthorized return rate at or above 0.5%. Looking at the last 9 months, we see that a

20

total unauthorized return rate of 0.8% with R10 making up most of that amount."

c.   Paytechco continued, "It is very important to address this issue, as it can affect the standing your company has with our bank and can lead to suspension of services. ... While this is only a warning, we will need to monitor your processing for the next 30 days to ensure a lower rate of unauthorized returns is received moving forward."

d.   Benoit forwarded Paytechco's response to Morgan, also writing:

> "I cannot make sense of the response ... but am sure you will !
> Please read this when you can ... and please translate ....and if he is right, can we make stats, so we know how many micros to submit to avoid being ever in this situation ?
> G"

e.   Morgan responded, "I understand, easier to explain on the phone.  Again if I was you I would stop new orders completely, you want to ramp down NRG in anycase [sic], whereas lately you are increasing the volume."

37.  Paytechco's September 2015 audit also illustrated the effect of the micro transactions.  Emails between Benoit and Paytechco in 2014 show that NRG Support processed transactions of two different values through Paytechco:  $39.95 and $.99. When applied to the September 2015 transactions that Paytechco processed for NRG Support, this means that the 37,609

transactions totaling $333,679.55 were split between 7,609 consumer debits (the $39.95 debits) and 30,000 micro transactions (the $.99 debits).  As discussed below in ¶ 45, in an email string involving **COURDY**, Paytechco's threshold for unauthorized returns was 0.5%.  Without the sham micro transactions, NRG Support's true unauthorized return rate for September 2015 was 2.2%, well above Paytechco's threshold.

38.  The emails showed that Benoit and associates regularly monitored the Benoit Entities' return rates and calculated the needed number of micro transactions.  For example, in an email chain from October 2019, "Mike Young" at mike@intertrans.com sent an email with the subject "Daily Recap and Micro Reporting" to Benoit at guy@cbxiinc.com, copying **COURDY** and "Ernie" at ernie@intertrans.com:

a.  Young attached a spreadsheet to his email, and advised Benoit that, based on his reporting, there was "a need for Micro's [sic]."  The spreadsheet reported all "regular" transactions and micro debits processed on October 22, 2019 for "My Kloud Box," "Silver Safe Box," "AddOn/Gigatech[2]," "Ecloud Secure," and "CloudNV."  According to the spreadsheet, on October 22, 2019 these five entities collectively processed 569 "regular" transactions totaling $24,754.30 and 8,165 micro debits totaling $12,883.75. The micro debits were in amounts ranging from $0.99 to $1.85.  With respect to My Kloud Box, the

---

[2] I believe this reference is to Add On Coupon Services and Gigatech.  Based on the spreadsheet and my review of the emails in this investigation, I believe these are additional Benoit Entities, nominally controlled by **BAUER**, as described below.

spreadsheet showed that for "Deposit Date 10.23.19 at 25%" the "Required Micro Debits" were "2800."

b.   Benoit subsequently sent Young two emails.  In his first email, he stated, "Your report is missing something WE calculate the un-auth on a month to date .... not on daily !" In his second email, he stated "The un-auth NACHA Rules are based on your monthly performance ...not on the daily."

c.   Young responded to Benoit's second email:  "I completely understand that.  Eddie told me to send these to you daily though so you know how many micro's you need to send in each day . . . .  You're [sic] monthly unauth rate right now for all of your accounts is roughly 0.12% on average and you only have to end up around 0.25% to be on the safe side, even with rising chargeback's [sic] coming in late.  I don't know if he told you but you spent an extra 175k last month on micro's [sic] and that's not including what you lost on tran fees, reserve, etc...."  I understand from other emails Young's reference to "Eddie" in this email to refer to **COURDY**.

39.  Furthermore, the emails showed that Benoit and associates were warned as to how banks perceived their fraudulent micro transactions.  In an email chain from June 2015, "Henry LoConti" forwarded **COURDY** an email string that included emails from payment processor "Sam Ackley" of "DCS Holdings Group" at sackley@dcsdeposits.com.  In his emails, Ackley posed questions related to NRG Support, including "bank has recently noted high micro transactions volume even though the web site shows pricing significantly higher.  They are

23

concerned the customer is 'gaming' the ACH system to return lower rates.  They have asked for an [sic] full explanation." **COURDY** then forwarded the email chain to Benoit at harold@nrg-support.com.

40.  Bank records showed that the Benoit Entities continued to conduct micro transactions through at least January 2021. For example, records produced on or about June 22, 2021 by Washington Federal Bank, N.A. showed that four accounts for Silver Safe Box opened by Harold Sobel in October 2019 and closed by the bank in January 2021 funded a total of over 800,000 micro transactions.  In January 2021 alone, one of those accounts funded approximately 16,450 withdrawals, all in the amount of $1.75, described in the account statement as withdrawals to "ECLOUD8442540040 . . . ," which I recognize to be Benoit Entity Ecloud Secure.

### E.   COURDY's and Intertrans's Contributions to Benoit's Fraud Scheme

41.  Emails showed that **COURDY** and other Intertrans personnel helped Benoit in at least three ways.  First, they helped to broker relationships and liaise between Benoit Entities and payment processors.  Second, **COURDY** advised Benoit on using micro transactions to suppress the Benoit Entities' high return rates.  Third, **COURDY** advised Benoit on prospective victim leads.  **COURDY'**s relationship with Benoit appears to have spanned continuously from 2013 or earlier to the time of the GoDaddy email search warrants in 2020, with no sign of ending.

24

1.   <u>Liaison to Payment Processors</u>

42.   Emails showed that from at least June 2015 through at least March 2020, **COURDY** assisted Benoit in establishing and maintaining payment processor relationships.  For example, when **COURDY** forwarded to Benoit the "ACH gaming" email chain described above at ¶ 39, **COURDY** added, "I just realized you did Not receive this when Henry sent it last night.  I was driving.... Call you In a couple of min.....trying to get Henry. And I'm calling Debra.  Did you get the data base back on line?" Benoit responded to **COURDY**, copying "John Murphy" at john@nrg-support.com, "Not having the new web site up ... and not having the proper verbage [sic] .... Causes the following questions.  I ws [sic] SURE this was all taken care of  Need website ON .... In the next hour with the verbage [sic] needed for the lower price points."  Later, Benoit emailed Murphy, writing "Hello John, I want you to work closely with Eddie, on getting out of this.  He will help us ... But follow his lead and offer explanations to all we may be required to give or answer .... Even if we will not be processing with them anymore."  I understand the reference to "Eddie" in Benoit's email to Murphy to mean **COURDY.**

43.   Additionally, emails between Intertrans and U Solutions Group from July 23, 2015 showed that **COURDY** brokered I-Support Group's relationship with U Solutions Group. Furthermore, in an email to U Solutions Group on October 6, 2016, **COURDY** addressed the I-Support Group audit results discussed in ¶ 32, explaining the high return rates as stemming

from new transactions, as opposed to recurring transactions. **COURDY** noted that "If you check the first file from the 23rd, which is almost aged, we know we're going to get unauths [sic] in for the first 6 weeks."  According to **COURDY**, I-Support Group "would require friendly traffic to bring them in line with an acceptable return ratio."

44.   Furthermore, on or about March 11, 2020, **COURDY** sent an email to payment processor "Wirebloom" personnel in which he introduced Benoit.  Copying Benoit at guy@cbxiinc.com, **COURDY** stated, "Eugene/Anna, Guy Benoit has been known to me for 12-14 years and currently resides in Cypress.  He is currently consulting for a major shipping company that transacts business globally.  I've attached your interview questionnaire in order to expedite a product conversation with him regarding your payments platform, which includes multiple currencies and individual IBAN numbers for expediting payments to this companies members.  Please respond to this email and arrange a call directly with Guy at your convenience."

### 2.   Micro Transactions

45.   The GoDaddy emails showed that **COURDY** and Intertrans helped the Benoit Entities plan micro transactions.  In addition to the October 2019 emails described in ¶ 38 above between Benoit, **COURDY,** and other Intertrans email accounts, for example, the following emails, all from October 2015, were in an email chain regarding unauthorized return rates at "Paytechco":

a.   randy@isupport-pro.com received an email from Paytechco that admonished, "Your current rate of unauthorized

returns is at 0.88%, which is above our allowable rate.  The rate for the previous month was at 0.48%, which is just below our allowable rate.  We kindly ask that you take care to reduce your rate as much as possible by the end of the month."

b.    randy@isupport-pro.com forwarded Paytechco's email to jenny.sullivan76@yahoo.com, copying **COURDY** and stating, "This percentage, does not match what you sent me yesterday !!! Please advise asap."

c.    **COURDY** responded to "Jenny," copying guy@nrg-support.com and john@isupport-pro.com, with the instructions: "NRG- I Support [sic] must get below 50 basis points immediately at Paytecho [sic].  Please get with me this morning after you run some percentages of how many micros are required over the next 3 days to drive that percentage down to approximately 30 basis points."  **COURDY**'s email further stated, "The report that Guy is requesting be corrected, is going to put NRG out of business.  We need to produce the correct number ourselves and guy [sic] will originate whatever is necessary to fix this problem."

46.  Based on my training and experience, and my knowledge of this investigation, I believe that, in the above-cited email exchange, **COURDY** was instructing coconspirators how to structure micro transactions to artificially deflate NRG's and I-Support's high return rates that otherwise would exceed NACHA's and Paytechco's thresholds.

47.  Later emails indicate that, with **COURDY**'s help, Benoit evolved his operation to conduct micro transactions for third

27

parties, not simply for the Benoit Entities.  On or about May 1,
2020, Benoit at theprofessor@cbxiinc.com emailed **COURDY** as
follows:

> "Hello Eddie
>
> I have been doing lots of analytics on several aspects of
> my business, and realizing that I am losing money in many
> areas
>
> Micros is one of them ..... and am losing money on all
> these accounts, as I have never calculated my costs, but
> thanks to you, I am becoming better at this
>
> On the 15th of May I will start charging per micro ....
> Instead of the per month as I was doing, as I am losing
> money in that manner
>
> Will come up with a price by Monday
>
> Lets have a chat over the week-end
>
> Guy"

That day, **COURDY** responded, "We are both learning and I
know you've increased your recognition of my personal value as
well as my teams."

48.  The emails also showed that **COURDY** allowed Benoit to
use his company "Globe Marketing Group, Inc" ("Globe Marketing")
to conduct micro transactions.  California Secretary of State
business filings show that Articles of Incorporation for Globe
Marketing were filed on July 9, 2013, identifying **COURDY** as the
business's registered agent and the **COURDY RESIDENCE** as the
business's street and mailing address.  On or about August 7,
2013, **COURDY** filed a Statement of Information that identified

**COURDY** as the business's secretary and changed the business's street and mailing address to 5950 Canoga Avenue, Suite 235 Woodland Hills, CA 91367.  On or about August 1, 2016, **COURDY** filed a Statement of Information asserting no changes in information.  According to the California Secretary of State's website, Globe Marketing's status is suspended, but, as explained below, mail in the name of Globe Marketing was delivered to the **COURDY OFFICE** in July 2021.

49.  Emails reflect that in June 2015, Benoit at guy@nrg-support.com sent an email to Murphy at john@nrg-support.com with the subject "Corporate checking account for Globe Marketing Group."  Attached to Benoit's email was a voided check in the name of Globe Marketing with the address **COURDY** provided in the above-mentioned 2013 Statement of Information.  Benoit instructed Murphy, "Get this accnt set up from Micros  Tomorrow we will sent [sic] 10 transactions through there  Am sending you another one to set up as well."  Also in June 2015, in the same response to "Sam Ackley" at payment processor DCS Holdings Group discussed in ¶ 39 above that concerned NRG Support, Benoit at harold@nrg-support.com claimed that Globe Marketing was a "3rd party compan[y] that we deal with."  Additionally, in July 2018, **COURDY** sent Benoit at guy@cbxiinc.com an email with the subject "DBA accounts setup for Micros" in which he listed Globe Marketing as a "DBA account" that they had not yet used at two payment processors.

3.   <u>Victim Lead Lists</u>

50.   Lastly, the GoDaddy emails showed that **COURDY** helped Benoit evaluate the sources of his consumer accounts (that is, target victims) to debit.  For example, on or about January 12, 2016, guy@nrg-support.com received an email from **COURDY** that compared the return rates in traffic from two sources, "Tim Munoz" and "Musa."  **COURDY** ended the email as follows:

a.   "The problem you're experiencing with this type of traffic is not going to stop…whether it's from Tim, Musa or anyone else. We are not experiencing the type of return activity that you have been exposed to over the last 2 years with other PC support merchants.  They are organically developing their own traffic and operating through affiliate networks and making certain that the consumers are actually coming to their sites and signing up for the service. The reason they're surviving is the consumers is [sic] directly authorizing the service."

b.   "Please understand, I want to see you continue to develop this business model but it now requires formal change. The ACH is going to eventually shut your accounts. Micro debits will not survive in their system."

c.   "Please consider opening up a project that will develop other traffic sources outside of the expertise that your internal team is capable of."

51.   Based on my training and experience, and my knowledge of this investigation, I believe that, in the above-cited email, **COURDY** was advising Benoit to identify prospective victim leads ("traffic sources") from whom the Benoit Entities could obtain

unauthorized debits without a resulting high return rate that
would exceed NACHA's thresholds and trigger inquiry and
evaluation.

52.   Subsequent emails indicated that **COURDY** continued to
work with Benoit to buy lead lists.  For example:

a.   On or about April 13, 2018, **COURDY** sent Benoit an
email in which he stated in part, "Add on coupons started last
summer and it would [sic] you and your team who do you delete it
delete it delete it.  Now you're simply going to let it run out
because I don't have money to buy traffic … Moussa situation and
currently provider of your traffic seems to be a delightful
topic for you when you remind me of the $43,000 he directly
stole from me.  I wouldn't thought since that relationship came
from me that you wouldn't had some more interest in throwing a
few thousand of those leads that are so good towards our JV [I
believe short for "joint venture"] . . . ."

b.   Similarly, on or about June 14, 2018, **COURDY** sent
Benoit an email in which he stated, "Please don't set [sic] on
the 250 transactions follow up with Jenny and Mike and get them
into the Penny scrub it's important if this traffic looks good
we can definitely buy some in [sic] the cost is pretty
reasonable cheap enough to where I could even come up with some
money that's if Jenny keeps making favorable mistakes in my
favor."

4.   <u>Continuing Relationship</u>

53.   The GoDaddy emails showed that **COURDY**'s relationship
with Benoit and the Benoit Entities continued into at least

31

August of 2020.  For example, on or about August 5, 2020, "Julia
Zavlana" at julia@nrg-support.com sent two emails to **COURDY**,
copying Benoit at guy@cbxiinc.com.  Both emails contained an
email chain entitled "Add On Weekly Distribution."  One email
indicated that a payment in the amount of $4,406.26 had been
sent to Intertrans.  The second email indicated that another
payment, in the amount of $852.11, had been sent to Intertrans.

54.  Furthermore, on or about August 10, 2020, **COURDY** sent
an email entitled "Needed Reports and Information" to "Julia
Zavlana" at julia@nrg-support.com, copying Benoit at
guy@cbxiinc.com.  The email began, "Julia, . . . we are
providing a list of items necessary for our team to complete
various partnership accounting reports and provide audits
through the respective processing gateways."  Listed under the
sentence "The following merchant accounts require daily checking
account activity temporarily" were "My Kloud Box," "Silversafe
Box," "CloudNV," and "Ecloud."  The email also listed
instructions under the headings "Dollar Web Sales," "Gigatech,"
"NRG," and "Accepta," in addition to other instructions.

55.  Based on my training and experience, and my knowledge
of this investigation, I recognize all the named entities other
than Accepta from GoDaddy records and bank records as Benoit
Entities and associated entities.  I further recognize Accepta
to be a payment processor used by the Benoit Entities.  Thus,
these emails in combination with the other evidence I have
described in this affidavit indicate that **COURDY** helped Benoit
run the Benoit Entities for at least six years, from no later

than 2014 to no earlier than 2020, and that the Benoit Entities
at times paid Intertrans for those services.  And based on
Benoit's California DMV record, which listed his address as the
**COURDY RESIDENCE**, being dated February 28, 2013, and the email
described at ¶ 44, I believe that **COURDY**'s relationship with
Benoit has spanned over a decade.

      **F.**    **COURDY OFFICE, COURDY RESIDENCE, and COURDY SERVERS**

    56.  I believe that **COURDY** currently operates Intertrans
from the **COURDY OFFICE**.  According to a mail forwarding request
submitted to the U.S. Postal Service on December 17, 2020,
**COURDY** requested all mail addressed to **COURDY** and Intertrans at
115 Pine Avenue, Suite 600, Long Beach, CA 90802, effective
December 1, 2020, to be forwarded to the **COURDY OFFICE**.  In July
2021, a U.S. Postal Inspector confirmed that mail was then being
addressed and delivered to Intertrans at the **COURDY OFFICE**.  In
particular, on or about July 8, 2021, a letter addressed to
Globe Marketing Group, Inc., the **COURDY** company that Benoit and
**COURDY** used to conduct micro transactions as discussed in ¶¶ 48
and 49 above, was delivered to the **COURDY OFFICE**.

    57.  Mail that was addressed and delivered to the **COURDY
RESIDENCE** in February and July 2021 indicates that Intertrans-
related materials will also be found at the **COURDY RESIDENCE**.
For example:

        a.  A letter delivered on or about February 16, 2021
was addressed on its envelope from Intertrans at the **COURDY
OFFICE** to "Ernest Trevino, Jr." at the **COURDY RESIDENCE**.  I
recognize the "Ernest Trevino" name from numerous other mailings

addressed and delivered to the **COURDY RESIDENCE.**  I also recognize "Ernest Trevino" from Benoit Entities' emails with Intertrans as being associated with Intertrans email account ernie@intertrans.com.

b.   A letter delivered on or about July 11, 2021 was addressed on its envelope from AT&T to Intertrans at the **COURDY RESIDENCE.**  The envelope purported to contain a statement.

58.  As for Intertrans's computer servers, I believe they are not located at the **COURDY RESIDENCE** or **COURDY OFFICE,** but are off-site at the **COURDY SERVERS.**  According to publicly available domain name system ("DNS") information accessed on March 2, 2021 (and re-confirmed on July 31, 2021), intertrans.com was created on September 25, 2000, was updated on September 26, 2020, and expires on September 25, 2021.  The DNS records indicated that both intertrans.com and its mail exchange server, mx.intertrans.com, are hosted by Psychz Networks c/o Profuse Solutions Inc. ("Psychz"), a third party data hosting company.  I subsequently learned from Psychz personnel in May and August 2021 the following information, among others, about its relationship to Intertrans:  Intertrans has a month-to-month service at Psychz's Los Angeles data center that started on November 19, 2020; Intertrans's service is for colocation, meaning that Intertrans's data is not hosted on Psychz equipment but rather Intertrans brought its own computer and networking equipment to Psychz's facility; Intertrans's equipment is located at "Cabinet ID YY2" in Psychz's data center on the first

floor of 700 Wilshire Boulevard, Los Angeles, California 90017; and no other customer's equipment is in Cabinet ID YY2.

**G.     Background on BAUER and the BAUER RESIDENCE**

59.   According to California Department of Motor Vehicles records that were accessed on April 2, 2020 and effective until April 12, 2023, **BAUER** was born in 1958 and resides at the **BAUER RESIDENCE.**   The **BAUER RESIDENCE** appears to be a single-family house. In September 2020, a U.S. Postal Inspector surveilled the **BAUER RESIDENCE** and observed a white Honda Odyssey in the driveway, which subsequent investigation revealed is registered to **BAUER.** In April 2021, a U.S. Postal Service employee confirmed that he had observed and interacted with the person depicted in **BAUER**'s California driver's license at the **BAUER RESIDENCE** several times a week over the course of the preceding few weeks.   The Postal Service employee encountered **BAUER** when he delivered mail to the mailbox mounted to the **BAUER RESIDENCE.**

60.   Mail related to Benoit Entities has been addressed and delivered to the **BAUER RESIDENCE.**   On or about July 16, 2021, letters that were addressed on their envelopes from "Citi" to respectively, Silver Safe Box and Add-On Coupon Services, were delivered to the **BAUER RESIDENCE.**   Based on my knowledge of this investigation, I know that Silver Safe Box and Add-On Coupon Services are Benoit Entities.

**H.     BAUER's Contributions to Benoit's Fraud Schemes**

61.   Emails and other records show that **BAUER** helped Benoit in at least three ways.  First, **BAUER** opened or served as a nominal owner of a GoDaddy account for domains associated with

35

the Benoit Entities.   Second, **BAUER** served at various times as a
nominal owner for numerous Benoit Entities.   And third, **BAUER**
opened business deposit accounts for Benoit Entities.

       1.   <u>Internet Domains</u>

    62.  According to the GoDaddy records, a GoDaddy account
(Shopper ID 152749678) was opened on March 28, 2017, in **BAUER's**
name, with a physical address at the **BAUER RESIDENCE** and an
email address of ebauer92648@gmail.com.   The IP address for that
transaction was 173.55.162.162.   My search of WHOIS records for
that IP address revealed that it resolves to Intertrans.

    63.  In an email chain from September 2017 between numerous
Benoit Entity email accounts, the subjects conducted an
accounting of all of their GoDaddy domains.   In an email to
jennifer@ecloud-secure.com and guy@cbxiinc.com, john@nrg-
support.com wrote, "Find attached a doc with all the current
godaddy login info.   To be noted - the 3rd account was setup by
EricB and Eddie, I have changed the password and email address
connected to this account. but they did set it up. It is also
Eric B's credit card on that account. Meaning, if he does not
keep that card in good standing, we could lose the
gigatechsupport.com emails and hosting." Attached to this email
from john@nrg-support.com was a .txt file.   Listed as "account
#3," gigatechsupport.com, was "customer number:  152749678."

    64.  Based on my knowledge of this investigation, I believe
that, in the above email from john@nrg-support.com, "Eric B"
referred to **BAUER** and "Eddie" referred to **COURDY**.

65.   According to GoDaddy records for Shopper ID 152749678, on March 6, 2018, the customer changed the account email address to product@ecloud-secure.com.  Three days later, the customer name was changed from **BAUER** to "Guy Benoit."  These changes originated from the Canadian IP address 108.163.136.38.

2.   Nominal Owner

66.   In a May 2018 email exchange between Benoit at guy@cbxiinc.com and Murphy at john@nrg-support.com concerning the "ownership" of ten Benoit Entities, Benoit identified "Eric Bauer" and "Eriic Bauer" as the "owner" of "ADDON" and "GIGA." I understand Benoit's statement to mean that Benoit charged **BAUER** with serving as the nominal owner of Benoit Entities Add-On Coupon Services and Gigatech.  My review of the GoDaddy emails indicates that Benoit, rather than **BAUER**, actually controlled these entities.

67.   GoDaddy emails support **BAUER**'s "ownership" of Add-On Coupon Services.  In emails exchanged in March 2017, Intertrans personnel and "John Murphy" at john@nrg-support.com discussed setting up a toll-free number for Add-On Coupon Services.  On March 6, 2017, Intertrans emailed Murphy, forwarding an earlier email from a telecommunications service provider and listing the "corporate info" for Add-On Coupon Services as **BAUER** at the **BAUER RESIDENCE.**

68.   GoDaddy emails indicate that **BAUER** also served as a nominal owner for NRG Support and Silver Safe Box.  In a January 2019 email exchange between Benoit at guy@nrg-support.com and an apparent accountant, the accountant asked Benoit, "Is Eric Bauer

37

the new owner for NRG/SSB for 2019?"  Benoit responded, "Right

now am using Eric Bauer as the DBA holder for NRG and SSB."

Based on my knowledge of this investigation, I understand

Benoit's references to NRG and SSB to mean, respectively, the

Benoit Entities NRG Support and Silver Safe Box.

       3.   Bank Accounts

69.  Bank records show that **BAUER** opened at least three

different deposit accounts for Benoit Entities:

       a.  In November 2015, **BAUER** opened an account at Bank

of the West for Add-on Coupon Services.  The Sole Proprietorship

Signature Card application for this account identified the

account name as "Eric S Bauer DBA Add-on Coupon Services"; the

account address as the **BAUER RESIDENCE**; and the business owner

as **BAUER**.  **BAUER** signed the application on November 20, 2015.

       b.  In April 2016, **BAUER** opened a deposit account at

Citibank, N.A. ("Citibank") for Add-On Coupon Services.  The

Business Deposit Account Application listed the business as

"Add-On Coupon Services"; the primary contact as **BAUER**; the

physical address as the **BAUER RESIDENCE**; and the "Business

Industry/Activity/Description" as "Marketing company that

provides coupon links to other businesses on their websites to

generate more business and gets paid a fee for those services."

**BAUER** is identified on the Business Deposit Account Application

as the owner of Add-On Coupon Services, and he signed the

Application on April 7, 2016.  On or about April 7, 2016, **BAUER**

and **COURDY** also signed a Business – General Delegation of

Operating Authority form through which **BAUER** made **COURDY** an authorized signer for the account.

      c.   In January 2019, **BAUER** opened an account at Citibank for Ecloud Secure.  The Business Deposit Account Application for this account identifies the business name as "Ecloud Secure"; the primary contact for the account as **BAUER**; the physical address for the account as the **BAUER RESIDENCE**; and the "Business Industry/Activity/Description" as "online marketing services for small businesses."  **BAUER** is also listed on the Business Deposit Account Application as the owner of Ecloud Secure, and he signed the Application on January 18, 2019.

      70.  Statements for these three accounts showed significant activity related to Benoit's fraud schemes:

      a.   Statements spanning November 2015 through January 2019 for Add-On Coupon Services' account at Bank of the West showed thousands of $0.99 micro transactions with the description "NRG 877.284.9393 WEB PMTS," $1.25 micro transactions with the description "DWS8886248867," $1.50 micro transactions with the description "ECLOUDSECURE8442 8442540040," and $1.50 micro transactions with the description "SilverSafeBox 8007574680."  Based on my knowledge of this investigation, I recognize "NRG," "DWS," "ECLOUDSECURE," and "SilversafeBox" in these descriptions to refer to Benoit Entities NRG Support, Dollar Web Sales, Ecloud Secure, and Silver Safe Box.

      b.   Statements spanning November 2018 through May 2019 for Add-On Coupon Services' account at Citibank showed

transfers of thousands of dollars to Dollar Web Sales, another
Benoit Entity.  They also showed numerous debits and credits
labeled as "SECURE PMT. SYS.," which appears from the GoDaddy
emails to refer to SPS, a payment processor for Benoit Entities.
Among the debits were many ACH debits in the amount of $47 that
were labeled as "RETURN."

       c.   Statements spanning January 2019 to August 2019
for Ecloud Secure's account at Citibank also showed numerous
debits and credits labeled as "SECURE PMT. SYS."  Among the
debits were many ACH debits in the amount of $45 that were
labeled as "RETURN."  The statements also showed numerous wire
transfers of thousands to tens of thousands of dollars each with
various Benoit Entities, including Dollar Web Sales, I-Support
Group, and NRG Support.

    71.  Bank records further showed that, in March 2021, **BAUER**
opened a business deposit account at Citibank for an entity
called "My Terabyte LLC" that has transferred money to a Benoit
Entity.  The May 2021 statement for this account showed a $5,000
wire transfer to NRG Support LLC on or about May 28, 2021.

    72.  Additionally, Citibank provided statements for an
entity called "Tech-Connect," which identified the **BAUER
RESIDENCE** as Tech-Connect's address.  From the GoDaddy emails, I
recognize Tech-Connect to be an entity associated with Benoit
and **COURDY.**  The Citibank records, alone and in combination with
other evidence described in this affidavit, show that business
operations are continuing as before among and between at least
some of the Benoit Entities through 2020 and 2021.  Statements

for Tech-Connect's account showed two wires to NRG Support LLC
in amounts of $5,000 and $3,908 in July 2020.  The statements
further showed wire transfers to and from Intertrans from
December 2019 through May 2021, the most recent of which was a
$500 transfer from Intertrans on or about May 17, 2021.  And
finally, the statements showed debits from "SECURE PMT. SYS."
from December 2019 through May 2021.  For example, the May 2021
statement for Tech-Connect's account showed two debits of $36.95
with the descriptions, "SECURE PMT. SYS. SPS Chgbk AGGREGATE
10638 May 13" and "SECURE PMT. SYS. SPS Chgbk AGGREGATE 10660
May 18."  From the GoDaddy emails, I recognize "SECURE PMT. SYS"
to refer to payment processor Secure Payment Systems, Inc. and
the debits to represent charges for returns.

## VI. <u>TRAINING AND EXPERIENCE CONCERNING INDIVIDUALS INVOLVED IN FINANCIAL CRIMES</u>

73.  I know that people in general, and individuals
involved in financial crimes in particular, use digital devices
to communicate with coconspirators and to conduct their unlawful
activities, and tend to keep their personal digital devices in
locations where they are easily located, readily accessible, and
close at hand, such as in a pocket, a backpack, a car, or their
home.

74.  In this case, emails showed that **COURDY** used multiple
digital devices in his dealings with Benoit.  For example, the
following emails, all from an email chain on July 21, 2020,
showed that **COURDY** used at least one desktop computer and one
iPhone for email:

a.   Benoit, at theprofessor@cbxiinc.com, sent an email to "Martin Jean" at martin@ccminfo.ca, copying **COURDY**. The email stated, "Hello Martin  Can you please create a new e.mail address :  eddie@nrg-support.com  We would need to set it up on Eddies' outlook ..... and have me receive all correspondence on guy@cbxiinc.com  Thanks  Guy"

b.   **COURDY** responded, adding "Joshua Barry" at joshualbarry11@gmail.com and stating, "Martin, If we need to assist in setting-up outlook on my desk top Josh from our company will assist. I included him above.  Thank you for your assistance."

c.   Following affirmative responses from both "Martin Jean" and "Joshua Barry," **COURDY** emailed, "Good job both of you. Josh  Last piece is just the set up on my iPhone.  Thank you both of you.  Eddie Courdy  562-685-3373"

75.  Due to the likely use of digital devices by the participants in this matter, among other reasons, this application seeks permission to search the persons of **COURDY** and **BAUER** in addition to a search of the **SUBJECT PREMISES.**  Because digital devices are considered items of value, as is information on those devices, I know that people in general, and individuals involved in fraud crimes in particular, do not commonly discard their devices or information on their devices when changing residences or even when upgrading or changing devices, but rather, the devices themselves or at least the data on the devices is maintained by such individuals.

76.   It is common practice for individuals involved in financial crimes to keep the evidence, fruits, and instrumentalities of their crimes in a place that is private, secure, and easily accessible, such as: (i) a residence or a car; (ii) on or offsite storage units, safes, or lockers; (iii) post office boxes; and/or (iv) boxes, lockers or other space maintained at commercial mail receiving companies.  Onsite and offsite storage, and offsite post office boxes, lockers and other space maintained at commercial mail receiving companies, and other storage facilities are used, among other reasons, for security and anonymity purposes, to maintain records in secure (and potentially anonymous or pseudonymous) locations in the event that property is compromised and/or becomes vulnerable to search or seizure by the government.  Secure and offsite storage can also be used to try to hide evidence associated with criminal activity.

77.   Individuals committing financial crimes use and maintain digital devices to store information about their crimes during and long after the crimes have been committed.  This information includes logs of transactions or browsing history; copies of documents submitted electronically; records of funds received; contacts for co-conspirators; records of locations visited to exchange proceeds of crime; and records of payments to or from co-conspirators.

78.   Individuals who commit financial crimes will often liquidate criminal proceeds to cash or cash equivalents (such as cashier's and traveler's checks, jewelry, or precious metals),

as well as use criminal proceeds to purchase or finance automobiles, real estate, and other types of property and assets, in order to launder the proceeds and profit from the crimes.  Such individuals may also transfer criminal proceeds to, and receive money from, co-schemers and others, including by use of digital funds transfer applications, such as Zelle. Proceeds may also be used to create new companies or investments as part of other potentially fraudulent activity and/or as a means to launder criminal proceeds into legitimate or semi-legitimate businesses.  Information concerning expenditures and purchases, and other financial information concerning income and work activity, is also evidence of criminal activity to the extent that persons involved in criminal activity do not have legitimate sources of income to support expenditures and purchases.

79.  Travel records, such as itineraries, tickets, boarding passes, motel and hotel receipts, passports and visas, and credit card receipts reflecting such travel, are often evidence of financial crimes, as these records can show the use of criminal proceeds and perpetrator's plans and/or wherewithal to leave the jurisdiction.

80.  Individuals who participate in schemes to commit financial crimes often work with co-conspirators with whom they communicate by phone, e-mail, text message, and social media, and the search of digital devices of co-habitants of these schemes can also rule out or tend to negate the possibility that

someone else committed the crime, which is itself evidence of the crime.

### VII. <u>**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**</u>

81. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

82.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

46

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

83.   The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

     a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrants I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrants: (1) depress the thumb and/or fingers of a **SUBJECT PERSON** on the device(s); and (2) hold the device(s) in front of the face of a **SUBJECT PERSON** with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

84. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

85. For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of Conspiracy to Commit Wire Fraud and Bank Fraud, in violation of 18 U.S.C. § 1349; Wire Fraud, in violation of 18 U.S.C. § 1343; and Bank Fraud, in violation of 18 U.S.C. § 1344, will //

be found at or in the persons and premises described in
Attachments A-1 through A-6.


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this ____ day of _____,
2021.

_____
The Honorable Maria A. Audero
UNITED STATES MAGISTRATE JUDGE

49